NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER KAUFMAN,<br><br>    *Plaintiff*,<br>v.<br>SUSSEX COUNTY EDUCATIONAL SERVICES COMMISSION, and JOHN DOES 1-5 and 6-10,<br><br>    *Defendants*. | Civil Action No. 16-8022<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

    **THIS MATTER** comes before the Court on Defendant Sussex County Educational Services Commission's (the "Commission" or "Defendant") motion for summary judgment. ECF No. 13. For the reasons set forth below, Defendant's motion is **GRANTED**.

**I.    BACKGROUND**

    This case arises from the nonrenewal of Plaintiff Jennifer Kaufman's ("Kaufman" or "Plaintiff") annual contract by her former employer, the Commission. The Commission is a public school district located in Sparta, New Jersey, which is composed of member school districts in Sussex County and governed by a Board of Directors (the "Board"). Def. Statement of Material Facts (hereinafter, "Def. SOMF") ¶ 1, ECF No. 13.3. The Commission, via the Board, declined to renew Plaintiff's contract on May 2, 2016 due to Plaintiff's performance reviews, response to a particular disciplinary incident, and unprofessional behavior upon being informed of said poor performance reviews. Plaintiff brings this action under the New Jersey Law Against

1

Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., to challenge her termination.

### A. Plaintiff's Employment with the Sussex County Educational Services Commission

From April 22, 2014 through June 30, 2016, Plaintiff served as the principal of Northern Hills Academy ("NHA"), a school operated by the Commission that provides special education and related services. Def. SOMF ¶¶ 3, 10. In this capacity, Plaintiff was responsible for overseeing the day-to-day operations of the building, and for ensuring the well-being of the students and staff. Id. ¶ 16. Plaintiff was supervised by Andrea Romano ("Romano"), the superintendent of the Commission. Pl. Statement of Material Facts (hereinafter, "Pl. SOMF") ¶ 2.

Plaintiff describes her first 18 months of employment with the Commission—the end of the 2013-2014 school year and the 2014-2015 school year—as "uneventful." Def. SOMF ¶ 20; Pl. SOMF ¶ 4. During that time, Plaintiff received four seemingly satisfactory performance reviews. Def. SOMF ¶ 21; Harrison Aff., Ex. 5, ECF No. 13.5. In July 2015, Romano prepared a performance review of Plaintiff which rated her performance as "proficient"[1] and identified Plaintiff's communication and community relations skills as areas for improvement. Def. SOMF ¶ 22; Pl. SOMF ¶ 5.

### B. Plaintiff's Knee Injury

On the morning of October 22, 2015, Plaintiff was involved in a motor vehicle accident which caused her to strike her knee against the vehicle's console. Def. SOMF ¶ 26. Plaintiff informed Romano of the accident and was encouraged to take the day off. Id. ¶ 27. Plaintiff

---

[1] The performance review, titled the "Principal Summative Performance Report," allowed for four possible performance ratings: Unacceptable, Developing/Needs Improvement, Proficient, and Exemplary. Romano Aff., Ex. A, ECF No. 13.7. The performance review defines "proficient" as "the expected level of performance." Id.

2

returned to work the following day and used the assistance of a cane to walk for a period after. Id. ¶ 28. A subsequent MRI revealed that Plaintiff suffered a torn meniscus which would require surgery to fix. Id. ¶¶ 32-33. Plaintiff was encouraged to apply for Family and Medical Leave Act ("FMLA") leave in order to undergo surgery. Id. ¶ 35; Pl. SOMF ¶ 16.[2] Plaintiff submitted her application for FMLA leave on December 12, 2015 seeking leave from January 12, 2016—the date of the surgery—until February 4, 2016. Def. SOMF ¶ 40. Prior to taking FMLA leave, Plaintiff used previously approved vacation time from Monday, December 28, 2015 through Wednesday, January 6, 2016. Id. ¶ 42. Plaintiff then took FMLA leave from Tuesday, January 12, 2016 through Wednesday, January 20, 2016. Id. ¶ 43. Plaintiff was able to return from FMLA leave two weeks earlier than expected and thus spent a total of seven work days out on FMLA leave. Id. During Plaintiff's absences—for vacation and for FMLA leave—Romano and two substitute administrators, Lou Ayers and Pam Brillante, assumed the duties of acting principal. Id. ¶ 46.

Upon her return, Plaintiff informed Romano that her doctor recommended she limit her walking when necessary, and rest and elevate her leg as needed. Id. ¶ 48. The Commission accommodated these requests. Id. On February 10, 2016, Plaintiff suffered knee pain and left school early. Id. ¶ 58. She spent the following day receiving treatment for her injured knee, and returned to work on February 12, 2016. Id. ¶¶ 58-59. Upon her return, Romano suggested to Plaintiff that she (Plaintiff) take half-days if she experienced further pain. Def. SOMF ¶ 59; Pl. Dep. 184:15-18. Romano also told Plaintiff that she did not need to patrol the hallways every hour. Def. SOMF ¶ 59; Pl. Dep. 188:11-12.

---

[2] Plaintiff testified that she "did not want to take FMLA leave" but that she was encouraged to do so by Commission employees in order to "protect" herself should she require more than the allotted sick and vacation days to recover from surgery. Def. SOMF ¶¶ 36-37; Pl. SOMF ¶ 16.

3

### C. Plaintiff's Performance Reviews

Prior to the 2015-2016 school year, Plaintiff received seemingly satisfactory performance reviews. Def. SOMF ¶¶ 21-22; Pl. SOMF ¶ 5. Reviews of her performance in the fall of the 2015-2016 school year appear relatively mixed. On November 12, 2015, Romano received an email from a parent of an NHA student in which the parent complained that Plaintiff failed to communicate and follow up regarding an accident involving the student. Def. SOMF ¶ 29. Yet, on November 20, 2015, Plaintiff received an evaluation which indicated areas of growth—such as "communication with staff, parents and Administrative Team" and "[f]ollow through with required reporting and personnel issues"—but also noted that "[i]ssues with staff have been dealt with in appropriate manners" and that Plaintiff demonstrated "noted improvement with corresponding with parents who have expressed concerns." Romano Aff., Ex. D. And on December 10, 2015, Romano issued Plaintiff a letter of commendation which recognized Plaintiff for "responding professionally and quickly" to resolve an incident involving a student on a field trip. Id., Ex. E.

However, while Plaintiff was on vacation and FMLA leave, Romano served as acting principal and became aware of issues—all of which Plaintiff disputes—with Plaintiff's performance. Romano testified that, on January 4, 2016, she discovered Plaintiff had allegedly approved a day off for a "1:1 paraprofessional," who was to provide necessary educational services for a student, but did not take any action to find a replacement. Def. SOMF ¶ 54.[3] Romano testified that also on January 4, 2016, three new hires reported to NHA without having completed the requisite fingerprinting or paperwork; they allegedly informed Romano that Plaintiff had not

---

[3] Plaintiff appears to contend that her secretary was responsible for noting staff absences on the shared calendar and for arranging replacement coverage. Plaintiff's Deposition Transcript 129:9-131:20 (hereinafter "Pl. Dep."), ECF No. 15.2.

4

advised them of these requirements during their interviews. Id. ¶ 51.[4] Romano also testified that she learned that Plaintiff had approved an internship for an occupational therapy student without informing NHA's occupational therapist, Jennifer Satmaria, or discussing with Satmaria her willingness to supervise the student. Id. ¶ 52.[5]

Based on these three events,[6] Romano emailed to Plaintiff an Employee Improvement Plan ("EIP") on February 4, 2016 (two weeks after Plaintiff's return from FMLA leave). Def. SOMF ¶ 49. The EIP identified issues with communication, staffing, and organizing professional development meetings.[7] Id. ¶ 50. Plaintiff submitted a rebuttal in which she disputed the factual bases for the EIP. Id. ¶¶ 56-57. On February 16, 2016, Plaintiff, Romano, and Erin Dunstan Siipola ("Siipola"), the Commission's Business Administrator and Affirmative Action Officer, met to discuss Plaintiff's EIP. Id. ¶¶ 61, 8, 9. At the meeting, they discussed additional issues that arose subsequent to the EIP's issuance: first, Plaintiff's failure to respond appropriately to an incident in which Plaintiff received a report that two students discussed having weapons and drugs

---

[4] Plaintiff maintains she provided the three new hires with information about paperwork and fingerprinting requirements, both orally and in writing, but that the three individuals did not "read instructions or . . . listen to directions." Pl. Dep. 115:9-120:5.

[5] Plaintiff denies that she approved the internship. She maintains that, while she was on leave, she received an email from an administrator at Eastwick University inquiring about internship opportunities and that she directed the administrator to contact Romano instead "because I could not help her because I was on leave." Pl. Dep. 120:14-126:6.

[6] The EIP also referenced a fourth incident that took place soon after Plaintiff's return to NHA in which Plaintiff engaged in a conversation with a staff member about whether to contact the Division of Youth and Family Services about a student while in the presence of another student. Def. SOMF ¶ 53. Romano called the conversation "not really appropriate," Romano Dep. 34:4, ECF No. 13.5, while Plaintiff maintains it was conducted "in vague terms." Pl. Dep. 127:17-18.

[7] This third point appears to concern an off-site professional development meeting that was cancelled, resulting in the Commission being charged cancellation fees by a bus company. See Romano Aff., Ex. H. Plaintiff contends that the meeting was cancelled while she was on vacation, that the "business office at the beginning of the year contracts and makes agreements with the bus companies," and that she does not "have anything to do with their [cancellation] policies." Pl. Dep. 132:19-135:19.

in their possession and allowed them to leave school on the bus without searching their belongings or contacting their parents or police; second, failing to deal with a staffing issue resulting from a nurse's absence; and third, assigning staff members to lead professional development sessions without informing them of such. Id. ¶ 61; Romano Aff., Ex. K.

Romano summarized the substance of the meeting in a memorandum to Plaintiff the following day. In that memorandum, she noted: "As you indicated in the meeting, some of the events occurred while you were either out on vacation or out on FMLA. Although you were out while the issues arose, they were directly a result of decisions that you made prior to your vacation and/or FMLA leave and were identified in the Employee Improvement Plan." Romano Aff., Ex. K.

On March 4, 2016, Romano issued Plaintiff another performance evaluation which identified areas of strength but also stressed that "school climate remains a challenge. . . . Feedback from staff has not shown that effective relationships have been built with the School Principal." Def. SOMF ¶ 65; Romano Aff., Ex. L. Plaintiff did not prepare a rebuttal to the evaluation. Def. SOMF ¶ 66.

**D. Termination of Plaintiff's Employment**

On or before April 28, 2016, Romano came to the decision that she was not going to recommend that Plaintiff's contract be renewed for the following year. Romano testified that this decision was based on Plaintiff's "continuous issues with communication with staff and parents. Although there might have been some improvement, it wasn't to the expected level that we would have required of a principal here. There were many indications that we were not having follow through with areas of technology, with curriculum, with budget." Romano Dep. 59:17-23.

On April 28, 2016, Romano met with Plaintiff to discuss her intention to recommend the nonrenewal of Plaintiff's contract to the Board of Education.[8] Id. ¶ 67. She told Plaintiff that the primary reason for the decision was the disconnect between Plaintiff and the staff of NHA.[9] Id. ¶ 68. At that point, Plaintiff said "'I can't hear any more of this,' and [] got up and [] walked out." Pl. Dep. 203:16-17. Plaintiff then proceeded to walk out of the building, but on her way, stopped and spoke with between three and six staff members to tell them what had happened. Pl. Dep. 206:15-207:13; 250:19-20. Plaintiff testified that she was crying during at least some of these conversations. Id.

The following day, Plaintiff reported to work wearing a t-shirt with "When are we leaving" printed on it. Pl. Dep. 251:16-252:1.[10] In a meeting that day, Romano issued Plaintiff two letters memorializing the previous day's conversation: in one, she summarized the outcome of the conversation and wrote, "I trust that you will be a professional through your contracted end-date of employment." Romano Aff., Ex. M. In the other, she expressed her dismay with Plaintiff's "unprofessional behavior" in response to the meeting. Id. She wrote:

> After you rudely and abruptly left my office and left for the day, several staff members shared with me that you walked into their classrooms and delivered the news that, "she was not renewing my contract." One staff member shared that it was a bizarre situation . . . and that you were so upset that she asked if someone had died. Another staff member came to me and directly asked me if it was true and would other staff be told if they were to be non-renewed that day. Your reaction and responses to staff have caused undue stress and concerns about others [sic] employment status, that may lead to disruption with instruction.
>
> In addition, staff shared with me that you texted or called them in the evening to discuss your non-renewal. Staff reported that you discussed the "disconnect with staff."

---

[8] Also in attendance was administrative assistant Jackie Klinger. Def. SOMF ¶ 67.
[9] Plaintiff contends that Romano phrased this as "no one likes you." Pl. Dep. 202:10-19.
[10] Defendant contends that the shirt read "when is your last day." Def. SOMF ¶ 71.

Id.

On May 2, 2016, Romano recommended to the Board that Plaintiff's contract not be renewed for the 2016-2017 school year. Def. SOMF ¶ 73. At the Board meeting, Plaintiff read prepared remarks, which included the following comment: "Since my October car accident, I noticed a marked change in Ms. Romano's demeanor towards me. But since returning from my FMLA leave on January 21st, I felt like there has been a target on my back." Pl. SOMF ¶ 35. The Board approved Romano's recommendation of nonrenewal. Def. SOMF ¶ 73.

On May 3, 2016, Plaintiff left work early after reporting to the school nurse with high blood pressure. Pl. SOMF ¶ 36. The following day, she returned to work and Romano advised her that she was being placed on paid administrative leave for the remainder of the year. Def. SOMF ¶ 72. Romano testified that this decision was based on Plaintiff's "disruptive behavior in the building and her medical concerns regarding her high blood pressure." Romano Dep. 72:13-16. Plaintiff remained on paid leave until her employment terminated on June 30, 2016. Pl. SOMF ¶ 40.

### E. Plaintiff's Claims

Plaintiff filed this action against the Sussex County Educational Services Commission and John Does 1-5 and 6-10 in state court on October 3, 2016. ECF No. 1.1. On October 28, 2016, Defendant removed this action to federal court. Id. Plaintiff brings five claims for: (1) discriminatory discharge based on disability in violation of NJLAD; (2) perception of disability discrimination in violation of NJLAD; (3) retaliation in violation of NJLAD; (4) discrimination in the course of contract in violation of NJLAD; and (5) retaliation in violation of FMLA. She also brings a sixth claim for "equitable relief."

## II. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

8

admissions, and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

When the Court considers a motion for summary judgment, "all facts and inferences are construed in the light most favorable to the non-moving party." Boyle v. Cty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). However, "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995).

### III. ANALYSIS

#### A. Plaintiff's FMLA Disability Claim (Count Five)

Plaintiff argues that the Commission terminated her employment in retaliation for her invocation of her right to take FMLA leave, in violation of FMLA. Defendant maintains it terminated Plaintiff's employment due to her poor performance during the 2015-2016 year. The Court disagrees with Plaintiff and finds that she has failed to demonstrate that her nonrenewal was causally related to her FMLA leave.

##### 1. **Prima Facie** Case

The FMLA was enacted to "balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1), (2). The Act provides employees the right to up to 12 weeks of leave in the event that the employee has a serious medical condition. Id. § 2612(a)(1)(D). The Act also provides that "it

9

shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise any right provided by the Act." Id. § 2615(a)(1). To establish a prima facie case of FMLA retaliation, Plaintiff must show that (1) she engaged in protected activity by requesting FMLA leave; (2) she suffered an adverse employment decision; and (3) the adverse decision was casually related to her request for leave. Capps v. Mondelez Global, LLC, 847 F.3d 114, 152 n.6 (3d Cir 2017). FMLA retaliation claims are analyzed using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Id. Plaintiff has demonstrated that she requested and took FMLA leave and that she was terminated, but she cannot establish that her termination was causally related to her request for leave.

Temporal proximity between the FMLA request and the adverse employment decision may suggest a causal connection. "To demonstrate a causal connection, a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 258 (3d Cir. 2014) (quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)); see also Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) ("In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection.").

Plaintiff cannot demonstrate an "unusually suggestive" temporal proximity between her FMLA leave and her termination. Plaintiff's FMLA leave, from Tuesday, January 12, 2016 through Wednesday, January 20, 2016, comprised a mere seven work days. She was informed of her likely nonrenewal three months later on April 28, 2016. See Yu v. U.S. Dept. of Veterans Affairs, 528 Fed. App'x. 181, 185 (3d Cir. 2013) (holding that the temporal proximity between

10

protected activity and termination of employment is "unusually suggestive" when termination occurs "within a few days but no longer than a month" in a case alleging First Amendment retaliation). The timing of Plaintiff's termination is even less suspect in light of the New Jersey statute that requires boards of education to inform nontenured staff of their contract renewal or nonrenewal by May 15 of each year. N.J.S.A. § 18A:27-10.

Plaintiff argues that the Court should look to the timing of her EIP, which was issued two weeks after her return from FMLA leave, to find that the timing of her termination was "unusually suggestive." Putting aside the fact that the EIP itself is not an adverse employment action,[11] this argument is nevertheless unsupported by the caselaw Plaintiff cites. Plaintiff cites Budhun, 765 F.3d 245, in which the Third Circuit overturned an order of summary judgment as to FMLA retaliation in the defendant employer's favor when an employee was replaced two days after she was to return from FMLA leave. The court in Budhun, emphasized that "[w]e have been reluctant to infer a causal connection based on temporal proximity alone," but noted that the "decision to replace Budhun before her FMLA leave ended" coupled with the hiring of her replacement "two days after [her] FMLA leave ended" constituted "unusually suggestive timing." Id. at 258. The

---

[11] "An 'adverse employment action' is an action that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" Budhun, 765 F.3d at 257 (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). An improvement plan, which by definition states areas in which an employee may improve his or her performance so as to continue employment, does no such thing. Even under the "less restrictive" definition of an adverse employment action, "'a plaintiff must show that a reasonable employee would have found the challenged [employment] action materially adverse,' such that the action well might have dissuaded a reasonable worker from taking a protected action." Budhun, 765 F.3d at 257 n.6 (citing Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006)). Employment actions such as reassignment or suspension without pay may meet this definition. Burlington Northern, 548 U.S. at 70-73; Caver v. City of Trenton, 420 F.3d 243, 256 (3d Cir. 2005); Weston v. Pa., 251 F.3d 420, 430-31 (3d Cir. 2001). While Plaintiff has indicated that receiving the EIP was unpleasant, she has not demonstrated that it was an adverse employment action under either definition.

11

Third Circuit then cited three cases in which timing was found to be "unusually suggestive" when an employee was terminated less than one week after invoking FMLA or returning from FMLA leave. Plaintiff has not cited any authority for the proposition that an action taken two weeks after returning from FMLA leave should be considered "unusually suggestive." Nor has Plaintiff demonstrated a pattern of antagonism sufficient to demonstrate a causal connection between her FMLA leave and her termination.[12] Accordingly, Plaintiff has failed to plead a prima facie case of FMLA discrimination.

### 2. Legitimate, Non-Discriminatory Reason for Termination

Even if Plaintiff had pled a prima facie case of discrimination in violation of the FMLA, she would be unable to make the requisite showing under the McDonnell Douglas burden-shifting framework. Under that framework, once a Plaintiff pleads a prima facie case of discrimination, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." Viscik, 173 N.J. at 14. The employer "need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Rather, the employer satisfies its "relatively light" burden of production "by introducing evidence which, taken as true, would permit the conclusion

---

[12] Plaintiff states in her brief: "as soon as she returned from leave, and in fact within 2 weeks, she began to receive written discipline. Plaintiff felt targeted and harassed. She was, in appropriately [sic] asked about medication and shorter working schedules. These facts in combination, and especially the temporal proximity, create the inference of retaliation." Pl. Brief at 22. She appears to argue that Romano exhibited discriminatory intent or antagonism by expressing concerns about Plaintiff's health. Id. at 18, 22. She notes that Romano asked Plaintiff if she was taking pain medication after her surgery and suggested that Plaintiff consider taking half-days if she experienced pain during the day. Pl. Dep. 184:15-18; 152:19-153:14. While these examples demonstrate that Romano was aware of Plaintiff's injuries, they are insufficient to demonstrate animus.

that there was a nondiscriminatory reason for the unfavorable employment decision." Id. After the defendant articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to show that "the employer's proffered reason was merely a pretext for discrimination" or retaliation. Id.

The Court is satisfied that the Commission has articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Defendant has demonstrated that Plaintiff failed to meet the Commission's expectations during the course of her tenure as principal of NHA, in terms of both her communication skills and her organizational skills, and that Romano, as superintendent, came to this conclusion on or before April 28, 2016. Romano documented her determination that Plaintiff lacked the "soft skills" necessary to improve school climate and to build effective relationships with staff and the community in her March 4, 2016 evaluation of Plaintiff. Romano Aff., Ex. L. This conclusion is corroborated by Romano's statement that 15 staff members "expressed to [her] concerns with [Plaintiff's] performance, among them issues [with] communication and follow-through." Romano Aff. ¶ 21. It is also corroborated by Siipola's testimony that Plaintiff exhibited "a lack of follow through" and that staff and parents complained about Plaintiff's lack of communication with them. Siipola Dep. 30:18-19, 31:2-33:10. Romano documented, in contemporaneous e-mails and in the February 4, 2016 EIP, her determination that Plaintiff lacked the organizational skills necessary to ensure adequate staffing and professional development. Romano Aff., Exs. H, I, J. While Plaintiff disputes the factual basis for the e-mails and the EIP, the undisputed evidence, including Plaintiff's November 2015 evaluation, supports Romano's testimony that Plaintiff's performance raised "continuous issues with communication with staff and parents" and that "[a]lthough there might have been some improvement, it wasn't to the expected level that we would have required of a principal here." Romano Dep. 59:17-23;

13

Casseus v. Elizabeth Gen. Med. Ctr., 287 N.J. Super. 396, 405 (N.J. Super. Ct. App. Div. 1996) ("it should require no citation to state that an employee's poor performance in discharging his duties is a legitimate nondiscriminatory reason to fire or demote the employee.").[13]

### 3. Pretext for Discrimination

Nor can Plaintiff demonstrate that these reasons are a pretext for discrimination. To establish pretext, Plaintiff must submit evidence that "either casts sufficient doubt upon the employer's proffered legitimate reason so that a factfinder could reasonably conclude it was fabricated, or that allows the factfinder to infer that discrimination was more likely than not the motivating or determinative cause of the termination decision." Svarnas v. AT&T Communications, 326 N.J. Super. 59, 82 (N.J. Sup. Ct. App. Div. 1999). At issue at the pretext stage "is whether discriminatory animus motivated the employer." Fuentes, 32 F.3d at 765.

Plaintiff appears to argue that the Commission's proffered reasons are pretextual because "prior to [Plaintiff's FMLA] leave, she had been graded as proficient in all her job responsibilities" but "as soon as she returned from leave, . . . she began to receive written discipline." Pl. Brief at 22. This argument mischaracterizes the record. Plaintiff's November 20, 2015 review, while largely positive, emphasized areas of weakness—such as "communication with staff, parents and Administrative Team" and "[f]ollow through with required reporting and personnel issues"—indicating that Plaintiff's performance in these areas was not meeting expectations at that time. Romano Aff., Ex. D. The review commends Plaintiff on her "noted improvement with

---

[13] Moreover, by the time Plaintiff actually suffered an adverse employment action (when the Board voted not to renew her contract on May 2, 2016), the Commission had additional non-discriminatory reasons to elect not to renew Plaintiff's contract: her abrupt exit from Romano's office on April 28, 2016 upon being informed of the basis of Romano's decision not to recommend renewal, and the unprofessional manner in which Plaintiff shared the news with other staff members and solicited their opinions on the merits of Romano's decision. See Romano Aff., Ex. M.

corresponding with parents who have expressed concerns," indicating that this was an area of weakness prior to November 2015. Id. The record also contains emails sent by Romano to Plaintiff on January 4, 2016 which document "staffing issues and business office issues" that arose before Plaintiff took medical leave on January 12, 2016. Romano Aff., Ex. J.

Plaintiff is correct that the majority of the documentation of her poor performance was written after she took her FMLA leave. But that documentation concerns specific events that took place after Plaintiff returned from leave, such as the February 9, 2016 incident in which Plaintiff failed to respond appropriately to a report concerning two students' possession of drugs and weapons. It also concerns staffing and organizational issues that came to light during Romano's stint as acting principal during Plaintiff's vacation and medical leave. The fact that Romano discovered deficiencies in Plaintiff's performance during her FMLA leave does not mean that addressing those deficiencies is FMLA retaliation.

As Plaintiff cannot plead a prima facie case of FMLA retaliation, nor would she be able to demonstrate that the Commission's proffered reasons are a pretext for discrimination,[14] the Commission is entitled to summary judgment on Count Five.

### B. Plaintiff's Disability Discrimination Claims under NJLAD (Counts One, Two, Three, and Four)

Plaintiff raises multiple theories in her disability discrimination claims. She argues that Defendant declined to renew her contract for a discriminatory reason—because of her disability as a result of the knee injury she sustained in the October 2015 car accident—and that in doing so, Defendant violated NJLAD (Count One). Plaintiff also argues that Defendant declined to renew

---

[14] Notably, during Romano's tenure, nine staff members availed themselves of FMLA leave. Of the nine, Plaintiff was the only individual whose contract Romano did not recommend be renewed. Romano Aff. ¶¶ 19-20.

her contract on the basis of a perceived disability—based again on the knee injury—in violation of NJLAD (Count Two). She argues that Defendant declined to renew her contract in retaliation for taking medical leave in violation of NJLAD (Count Three).[15] Finally, Plaintiff argues that Defendant placed her on administrative leave based on a disability—high blood pressure—and a perceived disability—again, high blood pressure—in violation of NJLAD.[16] Defendant contends that Plaintiff's termination was unrelated to her temporary or perceived disability or to medical leave, and that it placed Plaintiff on administrative leave due to her unprofessional behavior subsequent to her nonrenewal. The Court agrees with Defendant.

An NJLAD retaliation claim is also analyzed under the McDonnell Douglass burden-shifting framework. Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007); Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447-48 (2005). To establish a prima facie claim for disability or perception of disability discrimination under NJLAD, Plaintiff must show: (1) she belongs to a protected class; (2) she held a position for which she was objectively qualified; (3) she was terminated from that position; and (4) the employer sought to, or did, fill the position with a similarly-qualified person. Viscik v. Fowler Equipment Co., 173 N.J. 1, 14 (2002); Anderson v. Exxon Co., U.S.A., 89 N.J. 483, 495 (1982) (extending the analysis to perceived disability claims).

1. **Prima Facie Case**

The Commission concedes that Plaintiff meets the prima facie test as to her termination. Plaintiff was temporarily disabled or perceived to be disabled as a result of her knee injury, she was objectively qualified to perform the essential functions of her job, she was terminated from

---

[15] Schummer v. Black Bear Distribution, LLC, 965 F. Supp. 2d 493, 501 (D.N.J. 2013) ("Under the NJLAD, it is unlawful discrimination for an employer to discharge an employee on because of a disability or because he has engaged in a protected activity, such as taking FMLA leave.").
[16] The parties stipulated that this argument is subsumed in Counts One and Two of Plaintiff's Complaint. ECF No. 12.

16

the position, and she was replaced by another individual the following school year. Def. Brief at 26, ECF No. 13.2. However, Plaintiff cannot plead a prima facie case of discrimination as to being placed on paid leave because she cannot demonstrate the third prong, that she was terminated or suffered an adverse employment action, by virtue of having been placed on paid leave.

An adverse employment action is one that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Budhun, 765 F.3d at 257. It is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998). Paid administrative leave does not meet either of these definitions, particularly when it follows a decision to not renew Plaintiff's contract. Jones v. Southeastern Pa. Trans. Authority, 796 F.3d 323, 326 (2015) (holding that paid leave in the context of an employee suspended with pay pending an investigation was not an adverse employment action since it was "neither a refusal to hire nor a termination."). When, as here, the employee has already effectively been terminated and is placed on paid leave until the expiration of her contract, the administrative leave cannot be considered an adverse employment action. Accordingly, Plaintiff has pled a prima facie case of discrimination on the basis of disability, perceived disability, and medical leave with respect to her termination, but not as to her administrative paid leave.

### 2. Legitimate, Non-Discriminatory Reason

For the reasons articulated above, supra section III.A., the Court is satisfied that the Commission has articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Defendant has demonstrated that Plaintiff failed to meet expectations in terms of her

communication and organizational skills, in terms of improving school climate, in terms of building effective relationships with staff and the community, and in terms of responding professionally to negative feedback.

### 3. Pretext for Discrimination

Finally, Plaintiff has not met her burden of demonstrating that Defendant's proffered reasons are pretext for discrimination on the basis of disability or perceived disability. Plaintiff's argument relies on the premise that "the performance and documents which existed prior to [her] medical leave . . . were all positive and plaintiff had never received any form of discipline or coaching." Pl. Brief at 18, ECF No. 15. For the reasons articulated above, supra section III.A., this argument is unsupported by the record.[17]

Plaintiff appears to argue that Defendant's proffered reasons were fabricated subsequent to her medical leave, Pl. Brief at 18, but cannot support this claim with record evidence. And even if she could, such a showing would not be enough to demonstrate pretext; Plaintiff must also demonstrate that Defendant was motivated by discriminatory intent. Fuentes, 32 F.3d at 765; Viscik, 173 N.J. at 14. Plaintiff has made no such showing.[18]

Ultimately, while Plaintiff disputes the factual basis of the February 4, 2016 EIP, she has not demonstrated that the Commission's proffered reasons for termination are false, or that the decision was motivated by animus. She has failed to demonstrate that the Commission's reasons for terminating her employment were pretext for discrimination. As Plaintiff has failed to raise a

---

[17] Even if the Court were to construe Plaintiff's argument as contending her performance was rated positively prior to her October injury, and negatively after she suffered that injury, that argument would also be unsupported by the record. The record indicates that Plaintiff considered the performance evaluations she received prior to February 2016 to be "positive." Pl. Dep. 199:14-22. The record also indicates that Plaintiff received a letter commending her performance on December 10, 2015, subsequent to her injury. Romano Aff., Ex. E.
[18] See supra note 12.

genuine issue of material fact as to pretext, the Commission is entitled to summary judgment on Counts One, Two, Three, and Four.[19]

### C. Plaintiff's Claim for "Equitable Relief"

Plaintiff brings Count Six for "Equitable Relief." Compl. ¶¶ 46-54. Equitable relief is a remedy—indeed, one Plaintiff seeks in her other five counts—and not a cause of action itself. Accordingly, Count Six is dismissed.

### D. Plaintiff's John Doe Claims

Plaintiff alleges that unidentified John Does 1-5 and 6-10 discriminated and retaliated against her. These defendants have not been identified and there is no indication that they were ever served with the Complaint. Accordingly, Plaintiff's claims against John Does 1-5 and 6-10 are dismissed. See Guarneri v. Buckeye Pipe Line Servs. Co., 205 F. Supp. 3d 606, 619 (D.N.J. 2016) (granting summary judgment on John Doe claims when plaintiff failed to identify or serve John Does within the time required by Fed. R. Civ. P. 4(m) or show good cause for failing to effectuate service).

## IV. CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment is **GRANTED**. Judgment is awarded in Defendant's favor on Counts One through Five. Count Six is dismissed, as are all claims against John Doe defendants. An appropriate Order accompanies this Opinion.

**Dated: June 25, 2018**

                                                */s Madeline Cox Arleo*
                                                **Hon. Madeline Cox Arleo**
                                                **United States District Judge**

---

[19] Plaintiff brings Count Four for "Discrimination in the Course of Contract Under the LAD." Compl. ¶¶ 42-43. The Court is unaware of any statutory basis for this cause of action. The Court construes this Count as alleging that Defendant declined to renew Plaintiff's contract in violation of NJLAD, which is duplicative of Counts One, Two, and Three. Accordingly, the Commission is entitled to summary judgment on this Count as well.